**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

Irene Margaret McNamara,

          **Plaintiff,**          **Civil Action No. 11-10331**

      **vs.**             **District Judge John Corbett O'Meara**

**Commissioner of Social**         **Magistrate Judge Mona K. Majzoub**
**Security,**

          **Defendant.**
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Irene Margaret McNamara seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to social security income and disability benefits for her schizoaffective disorder.  (Dkt. 1.) 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c). Before the Court are the parties' motions for summary judgment.  (Dkt. 10, 12.)

      The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Dkt. 3.)  The Court has reviewed the pleadings, dispenses with a hearing, and is now ready to issue its report and recommendation.[1]

## I.      Recommendation

      Because the Court finds that substantial evidence supports Defendant's final decision denying Plaintiff's request and that the ALJ's hypothetical situation presented to the vocational expert was not impermissibly contrary to law and encompassed Plaintiff's mental limitations, the Court recommends that Plaintiff's motion for summary judgment be DENIED, Defendant's motion

---

[1]E.D. Mich. LR 7.1(f)(2).

1

for summary judgment be GRANTED, and that this case be DISMISSED.

## II.   Report

### A.   Facts

#### 1.   Procedural facts

On August 25, 2008 Plaintiff filed for social security disability and disability insurance benefits alleging disability beginning June 1, 2008.  (AR at 15.)  Defendant initially denied Plaintiff's request.  (*Id*.)  Plaintiff then requested a hearing.  (*Id*.)  On December 14, 2009 the ALJ conducted Plaintiff's disability benefits hearing.  (*Id*. at 28.)  Several months later, on March 24, 2010 the ALJ denied Plaintiff's benefits request.  (*Id*. at 12.)  Plaintiff sought review and the Appeals Council denied Plaintiff's request.  (*Id*. at 6.)  Plaintiff then filed this complaint, seeking judicial review of Defendant's final decision.  (Dkt. 1.)

#### 2.   The hearing

##### a.   Plaintiff's testimony

Plaintiff testified at her hearing.  At it, she related why she believed she is disabled and told the ALJ about her daily living activities.  Plaintiff stated that she believed she was disabled due to her schizoaffective disorder.  (AR at 35.)  The ALJ asked Plaintiff "[w]hat about [her] condition interfere[d] with [her] ability to work."  (*Id*.)  Plaintiff responded that she felt she was not "able to answer that question entirely based on the situation that [she's] not working currently at the time." (*Id.*)

She stated that she was prescribed medication (Wellbutrin and Abilify) for her disorder, had been taking it, and that it helped her.  (*Id*. at 35-36.)  She did state that she suffered several side effects from her medication–dry mouth and crying spells (once or twice a month for five to ten

minutes). (*Id.*) She stated that she also experienced a loss of interest in interacting with other people. (*Id.* at 37.) When questioned whether she had difficulty concentrating, she responded that she did, at times of high levels of stress. (*Id.*)

As to a normal day, Plaintiff stated that she usually rises at 5:30 and then helps prepare breakfast–boiling water for oatmeal and then measuring out the oats. (*Id.* at 41.) After breakfast, she stated that she gets ready for the day. (*Id.*)

Plaintiff attends college. She gets to class using public transportation. (*Id.*) At school, although she does not go out with as many friends as she used to, she stated that she is involved in a geology club that meets every Monday. (*Id.*) Although she stated that she has not attended the Monday meetings recently, this is because her schedule has not permitted her to attend those meetings frequently. But Plaintiff stated that her condition did not cause her to miss any classes. (*Id.*)

In her free time, Plaintiff reported that she reads and watches television. (*Id.* at 42.) She stated that she reads "informative awareness books"–books about "emotions or behaviors of humans." (*Id.*)

Plaintiff also stated that she was involved in managing her finances and that she and her husband share in those duties. (*Id.* at 38.)

When questioned by her attorney about the frequency of her impairments, she answered that once a week she suffers depression to the point that she is unable to go out of the house. (*Id.* at 44.) Plaintiff stated that she feels withdrawn and has five to ten minutes of sadness during these periods of depression. (*Id.*)

### b.    The ALJ's hypothetical situations posed to the vocational expert

3

During the hearing, the ALJ posed several hypothetical situations to the vocational expert. In her motion, Plaintiff challenges the hypothetical situations. The ALJ first asked a hypothetical relating to whether Plaintiff could perform past relevant work:

> Assuming a hypothetical individual the same age, education, and the job background as [Plaintiff.] Would have a residual functional capacity that would cause at least moderate difficulties in maintaining concentration, persistence, and pace. Moderate difficulties in social functioning. Was limited to simple routine tasks consistent with unskilled work. And no more than occasional contact with the general public. Assume a hypothetical individual with that residual functional capacity. Could such an individual do any of [Plaintiff's] past work either as [Plaintiff] did that or as it's generally done in the economy?

The vocational expert stated that Plaintiff could perform the work of a statistical clerk, an office clerk, and a night auditory. (*Id.* at 48.) If the hypothetical involved simple unskilled jobs, Plaintiff would not be able to perform any of her past relevant work.[2] (*Id.*) The ALJ then posed the second hypothetical:

> All right. Let me ask you to consider a hypothetical individual dealing with the same background as [Plaintiff]. Who, again, was limited to simple routine tasks consistent with unskilled work. And no more than occasional contact with the general public. No physical restrictions other than avoidance of unprotected heights or hazardous moving machinery. Assume a hypothetical individual with that residual functional capacity. Could you identify jobs that exist in the economy and, if so, if you would indicate the manner in which the jobs classified with regard to the exertional level, and number of jobs in each occupation[.]

(AR at 49.) The vocational expert testified that Plaintiff could work as a housekeeper/cleaner, or a linen room attendant of a hotel or restaurant, or a launderer. (*Id.*) The vocational expert then testified that there were ample number of jobs in the national and Michigan economies that Plaintiff could secure. (*Id.*) And the vocational expert stated that the jobs listed "would involve little or no

---

[2]The Court recognizes that this hypothetical is confusing. The Court notes that there is an inaudible section in the transcript. But the Court need not dwell on this past relevant work hypothetical, as the other hypothetical situations capture Plaintiff's impairments.

4

public contact." (*Id.*)  The ALJ asked a follow up question: "[a]ssuming the same hypothetical individual would anticipate to miss one or more days a week on a regular and ongoing basis.  Would all those jobs you've described maintain all full time competitive employment [] ?" (*Id.*)  The vocational expert responded affirmatively. (*Id.*)

> Plaintiff's counsel then asked the vocational expert:
>
> [I]f [Plaintiff] were found to have an inability to complete the normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods and that ability was severe, moderately severely impaired meaning that she could perform that no more than two hours in an eight hour day, would that preclude employment?

(*Id.* at 50.)  The vocational expert stated that those limitations would preclude employment. (*Id.*)

> The ALJ then posed another hypothetical:
>
> Assuming a hypothetical individual the same background as [Plaintiff.] And marked deficiencies in concentration, persistence, and pace such as indicated in Exhibit 10F, which would indicate the ability to maintain concentration, persistence, and pace for at least a two hour period.  Assuming a hypothetical individual with the same background as [Plaintiff], with that impairment would that allow for full[]time competitive employment[]?

(AR at 50.)  The vocational expert stated that, if Plaintiff could only work less than two hours, she would not be able to perform full time competitive employment. (*Id.*)

### 3.   The ALJ's written decision

In his written decision, the ALJ found that Plaintiff had the following severe impairments: schizoaffective disorder with psychotic features, schizoid personality disorder, attention deficit hyperactivity disorder (ADHD), static encephalopathy, and history of seizure disorder. (AR at 17.)

At step three, the ALJ determined that Plaintiff did not have an impairment that met or

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[3]  The ALJ analyzed Plaintiff's records under the 12.04(B) and (C) standards.  (AR at 18.)  Under the Paragraph B criteria, the ALJ found that Plaintiff had moderate restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence or pace.  (*Id*.)  Under Paragraph B, the ALJ also found that Plaintiff experienced one to two episodes of decompensation, each of extended duration.  (*Id*.)  Because the ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the ALJ held that the Paragraph B criteria were not satisfied.  (*Id*.)

Under the Paragraph C criteria, the ALJ found that the C criteria were not satisfied because Plaintiff was capable of living alone, was functionally independent, and she did not require a highly supportive structured living arrangement.

---

[3]

These factors are the factors that 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders requires Defendant to analyze when determining whether a claimant's mental disorder is severe and limits the claimant's ability to perform substantial gainful activity.  Paragraph C requires Defendant to assess the claimant's functional limitation using four criteria: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  *Id*.  For Section 12.04 affective disorders, the requisite severity is met when the claimant shows that he has two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.  *Id*. at 12.04(B).  A plaintiff can also meet the 12.04 listing by establishing the 12.04 Paragraph C criteria: "Medically documented history of a chronic affective disorder or at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensaion, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  *Id*. at 12.04(C).

6

The ALJ then calculated Plaintiff's residual functional capacity, taking into account the finding that Plaintiff had not satisfied the Paragraph B or C criteria of section 12.04. (AR at 18.) The ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple routine tasks (with some difficultly with concentration at times) with no more than occasional contact with the general public (may be easily irritated) and avoidance of exposure to unprotected heights and hazardous machinery (history of seizures). (*Id.*)

In making this determination, the ALJ summarized Plaintiff's testimony at the hearing:

> She was in college in 2008 and is disabled due to mental impairments. She has crying spells 1-2 times a month. Her weight is up. She and her husband pay the bills. She catches the bus to school for college classes. Her illness has not stopped her from going to class. She belongs to groups, but has days that she does not leave the house. She also has mood swings and even cooking a meal can be stressful.

(AR at 18-19.)

The ALJ then went through Plaintiff's medical records. He noted Plaintiff's 2005 suicide attempt and bipolar disorder with psychosis diagnosis. (AR at 19.) He also noted that, in October, 2006, Plaintiff was working full time and denied hearing voices or having hallucinations. (*Id.*) At that time, the ALJ also recognized that Plaintiff's records show that she did not display any delusions, was seizure-free, and had a Global Assessment of Functioning of 65, denoting mild limitations functioning socially and occupationally. (*Id.*) The ALJ then pointed out that Plaintiff was hospitalized again in January, 2008, and again diagnosed with bipolar disorder with psychosis. (*Id.*) In January, 2008 Plaintiff stated that her medication was helping her. (*Id.*)

The ALJ noted that October 2008 records indicated that Plaintiff was again diagnosed as having schizoaffective disorder, bipolar type with psychotic episode, ADHD, and schizoid

personality disorder. (AR at 20.) Those records, the ALJ pointed out, indicated that the doctor found that Plaintiff got along with others, was involved in a relationship, liked to play cards, was able to cook, play the piano, and read. (*Id*.) The ALJ also pointed out that the records showed that Plaintiff was capable of handling her own affairs, including financial, and shared shopping chores, cleaning, laundry, and executive matters. (*Id*.) The report did show, the ALJ found, that Plaintiff reported a lack of interest in activities, social withdrawal, and isolation. (*Id*.) The October 2008 examining doctor gave Plaintiff a GAF of 60, indicating that Plaintiff would be expected to experience moderate limitations functioning social and occupationally. (*Id*.)

The ALJ then found that, by 2009, Plaintiff's records show that she was doing well concerning her neurology and schizoaffective disorder–she was not having hallucinations or any limitations. (AR at 20.)

Looking at the entire record, the ALJ summarized that Plaintiff's "diagnosed impairments are rather mild in severity, even though in combination they do reasonably impact her ability to function." (AR at 20.) The ALJ stated that "[a] noteworthy aspect of the mental health treatment is that with ongoing outpatient treatment and psychotropic medication [Plaintiff's] condition stabilizes." (*Id*. at 20-21.) The ALJ then noted that the record did not show that Plaintiff's symptomatology was debilitating or unmanageable. (*Id*. at 21.) He focused on Plaintiff's marrying, attending college classes, and remaining independent in her activities of daily living. (*Id*.) He stated that the mental health treatment assessments and notes also did not indicate that Plaintiff had significant problems with functioning in social settings. (*Id*.) And the ALJ finally noted that Plaintiff's "[c]ognitive functioning is intact consistently and [Plaintiff] generally expresses logical, coherent thoughts using speech at a regular rate and rhythm." (*Id*.)

8

The ALJ then addressed the social worker Amy Rendon's October 2009 opinion, upon whose opinion Plaintiff argues the Court should rely.  (AR at 21.)  The ALJ noted that Rendon "opined that [Plaintiff] had marked deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner" and therefore Plaintiff would be unable to work forty hours a week.  (*Id*.)  The ALJ did not find Rendon's opinion convincing.  (*Id*.)  He stated that Rendon had only seen Plaintiff for three months, and her statement "lack[ed] specificity regarding the underlying findings (mental status exam findings) or other rationale to persuasively" show that Plaintiff was disabled.  (*Id*.)  The ALJ stated that, because Rendon's statement that Plaintiff "cannot handle the stress associated with employment" was vague and unsubstantiated, he gave "little credence" to the opinion.  (*Id*.)

The ALJ discussed why he found the state agency medical consultant's opinion more persuasive.  He stated that he gave more weight to the state agency medical consultant because the medical consultant "provided specific reasons for the opinions regarding [Plaintiff's] residual functional capacity which shows that the opinions were grounded in the evidence in the case record."  (*Id*.)

The ALJ stated that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that the symptoms were inconsistent with Plaintiff's residual functional capacity assessment.  (*Id*.)

The ALJ then determined that Plaintiff was not able to perform any of her past relevant work. He then went on to find, at step five, that there were jobs in the economy that Plaintiff could perform.  (AR at 22.)  The ALJ determined that Plaintiff would be able to perform work at all

exertional levels, but that nonexertional limitations would compromise her ability to perform at that level. (*Id*.) The ALJ then stated that he "asked the vocational expert whether jobs exist[ed] in the national economy for an individual with [Plaintiff's] age, education, work experience, and residual functional capacity." (*Id*. at 22-23.) The ALJ that stated that the vocational expert answered affirmatively. (*Id*. at 23.)

### 4.   Plaintiff's medical records

Plaintiff argues that Defendant did not properly factor in her mental condition. The Court therefore looks to the medical records that address her mental condition. The earliest of these records is from 2005, when Plaintiff admitted herself into a hospital for depression. As the records reach into Plaintiff's alleged disability date, in 2008, the majority of the records show that Plaintiff's conditions, although somewhat limiting, are not debilitating.

In June 2005 a Chelsea Community Hospital discharge report shows that Plaintiff had been suicidal in the past, but that she denied feeling suicidal at the time the report was written. (AR at 196.) At her discharge, Plaintiff also stated that she was having difficulty falling asleep. (*Id*.) She stated that she had racing thoughts and problems concentrating. (*Id*.) She also reported that she heard a voice that tells her to do certain things. (*Id*.) The interviewer also stated that during the interview, Plaintiff, at times, sat with her eyes closed and stated that she would feel tired if she opened her eyes. (*Id*.) The interviewer reported that Plaintiff did not acknowledge any symptoms of mania. (*Id*.) The interviewer assessed Plaintiff's mental status: poorly groomed; made no eye contact; pleasant and had a reluctantly cooperative mood; markedly guarded; depressed mood; blunt affect; sparse speech, but clear and coherent; marked psychomotor retardation and evidence of auditory hallucinations; denies suicidality; cognitively intact, suboptimal judgment and insight; and

alert and oriented to person and place.  (AR at 197.)

An October 2006 Lincoln Behavioral Services Social Functioning Assessment indicates that Plaintiff's appearance was disheveled but that her grooming was appropriate.  (AR at 225.)  The assessment also indicates that Plaintiff was anxious and had hyperverbal speech, giving tangential answers to questions.  (*Id.*)  The assessment shows that Plaintiff had reported no recent sleep or appetite disturbances and that her hygiene was appropriate.  (*Id.* at 226.)  The assessment also shows that Plaintiff's intellectual functioning appeared to be within the average limits with insight and judgment intact.  (*Id.* at 227.)  And the assessment shows that Plaintiff denied any recent or remote memory deficits.  (*Id.*)

A January 2007 Lincoln Behavioral Services Psychosocial Assessment shows that Plaintiff was disheveled but had appropriate grooming.  (AR at 231.)  Plaintiff was anxious, but, as in 2006, her intellectual functioning appeared to be within the average limits with insight and judgment intact.  (*Id.*)  Although the assessment hints that Plaintiff may have been responding to auditory hallucinations, Plaintiff denied such hallucinations.  (*Id.*)

This assessment also shows that Plaintiff felt safe in her home and community, was mobile and independent, maintained her own apartment, was capable of doing chores, was able to take care of her personal business, could grocery shop and conduct her own banking, and had various hobbies. (AR at 232.)

The assessment does show Plaintiff had difficultly responding to some questions, leading the interviewing physician to question whether Plaintiff heard voices, but again, Plaintiff denied hearing any voices.  (AR at 238.)  The assessment also shows that there were times during Plaintiff's interview where she appeared confused, but the report also shows that Plaintiff was easily able to

11

reorient herself.  (*Id.*)

Ten months later, in November, 2007 Plaintiff had another psychosocial assessment with Lincoln Behavioral Services.  (AR at 241.)  At this appointment, the interviewer wrote that Plaintiff had many of the same issues as before, but that Plaintiff was "not exhibiting these symptoms [(the hyperverbal and extreme anxiety)] to the same degree" as previously.  (*Id.*)

In October 2007 Lincoln Behavioral Services found that Plaintiff was "able to manage her symptoms and function in the community . . . with support in taking medications and supportive therapy."  (AR at 248.)  The report stated that, without support, Plaintiff could need hospitalization in the future, but that, at the time of the report, Plaintiff did not need daily monitoring or hospitalization.  (*Id.*)

In January, 2008 Plaintiff visited Henry Ford Hospital.  At Henry Ford, Plaintiff had group counseling, recreational therapy, occupational therapy, a psychoeducation assessment, and was in a substance abuse group.  (AR at 208.)  The physician stated that Plaintiff initially was isolative but became "more compliant and more interactive."  (*Id.*)  And the physician stated that Plaintiff had improved overall and improved in terms of mood, behavior, sleep, and appetite.  (*Id.*)  The physician also stated that Plaintiff denied any homicidal or suicidal thoughts.  (*Id.*)  The physician noted that Plaintiff stated that the medication was helping her.  (*Id.*)  The physician also noted that Plaintiff's affect was improved, appropriate, and stable.  (*Id.*)

On September 8, 2008 Plaintiff filled out a disability report.  The report asked the question, "[h]ow do your illnesses, injuries, or condition limit your ability to work?"  (AR at 141.)  To that question, Plaintiff responded, "I am not sure if my condition limits me to work.  I personally don't see a challenge with working.  It's about how things are processed and people don't like how I

process information." (*Id*.) On this report, she also wrote that there is "nothing" that she could do after her illness that she could not do before her illness. (*Id*. at 150.) She also wrote that her disorder affected her sleep by making her restless, shaky, altering her mood, and causing her to toss and turn at night. (*Id*.)

She also discussed her home life on this report. She wrote that she was able to prepare several course meals, and was able to do so daily, and she also wrote that she was able to clean, do laundry, make household repairs, and prepare her own taxes. (*Id*. at 151.) She stated that she was able to get around fairly well. (*Id*. at 152.) And she stated that she was able to shop in stores, by phone, by mail, and by computer. (*Id*.) She also wrote that she could handle her money, by paying bills, counting change, handling a savings account, and using a checkbook/money orders. (*Id*. at 152.)

She stated that she was in daily contact with other people and regularly visited fitness centers, the library, and various other places. (AR at 153.) She did state, though, that she was not as interested in her social activities as she was before her illness. (*Id*. at 154.)

Also on this report, Plaintiff checked boxes that her disorder affected her ability to: complete tasks, concentrate, understand, follow directions, use her hands, and get along with others. (AR at 154.) In explaining these limitations, Plaintiff stated that her disorder causes her to take longer than expected to complete some tasks and comprehend all the materials. (*Id*.) She also stated that she found it challenging to ask for assistance. (*Id*.)

In work situations, she explained that she followed written instructions well, spoken instructions fairly well, and that she got along "good" with authority figures. (AR at 154-155.) She further stated that she handled stress by "roll[ing] with the punches" and that she handled changes

13

in routine "fairly well."  (*Id*. at 155.)

On her second disability report, Plaintiff stated that her disability "may have gotten worse." (AR at 168.)  But she also stated that she had no new conditions.  (*Id*.)  Plaintiff stated that her condition affected her ability to be well-organized.  (*Id*. at 171.)

On October 15, 2008 Dr. Thomas S. Rosenbaum saw and evaluated Plaintiff.  (AR at 270.) Dr. Rosenbaum stated that Plaintiff had a "rather detached, flat affect," and that she maintained a "defensive and distanced posture[.]"  (*Id*. at 267-68.)  He also stated that Plaintiff reported feeling overwhelmed with too many tasks at times.  (*Id*. at 268.)  But he also found that Plaintiff was "pleasant, insightful, and quite compartmentalized in her thinking."  (*Id.*)  He reported that the conversation he had with her was "spontaneous, organized, and matter-of-fact."  (*Id.*)  He also reported that Plaintiff stated that she was not experiencing any hallucinations or delusions.  (*Id.*) She also stated that she slept well and had a normal appetite.  (*Id.*)

Amy Rendon saw Plaintiff from June 29 to September 23, 2009.  (AR at 329.)  The opinion consists primarily of Rendon's circling "yes" or "no" to various questions posed by the form and checking boxes.  (*Id.*) Rendon circled "marked' to the question whether Plaintiff suffered from "[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere)."  (*Id*. at 330).  In answering the form's question whether Plaintiff suffered from any non-exertional limitations that would interfere with Plaintiff's ability to work, Rendon responded: "Ability to retain information/memory is impaired making task completion difficult.  Easily fatigued; concentration fair to pair [sic]. Disorganized thoughts."  (*Id*. at 332.)  Rendon also found that Plaintiff would not be able to perform a sedentary/low stress job on a 40-hour work week on a regular and sustained basis.  (*Id.*)  Rendon did not offer an explanation

14

other than "[s]ee above." (*Id.*) Rendon then stated that "[s]tress is a trigger for her symptoms to increase. I feel 40 hrs is too much for her at this time." (*Id.*)

In June 2009 Plaintiff began seeing Dr. Ray Rion at Packard Health. Dr. Rion noted that Plaintiff was stable on her medications, was pleasant, and experienced no noted distress. (AR at 354.) The report also indicates that Plaintiff felt "down" between one and two days a month. (*Id.*) Despite feeling down, the report shows that Plaintiff had used "coping skills" and had been "able to pull out of it." (*Id.*) The report does show that Plaintiff had concentration and task completion issues and that Plaintiff could be forgetful and disorganized. (*Id.*) But the report also shows that Plaintiff was able to cope by using notepads for reminders. (*Id.*) In September 2009 Plaintiff visited Dr. Rion again. (*Id.* at 352.) He stated that Plaintiff was "pleasant" and was "feeling quite well." (*Id.*) In November 2009 Plaintiff was examined again by Dr. Rion. (AR at 350.) Dr. Rion stated that "[s]he has been feeling fairly well . . . . is on the same meds and has not really had any problems." (*Id.*)

### B.    Standards of review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to

15

try cases, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.    Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

1. she was not presently engaged in substantial gainful employment; and

2. she suffered from a severe impairment; and

3. the impairment met or was medically equal to a "listed impairment;" or

4. she did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity

("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

### C.    Analysis

Plaintiff first argues that substantial evidence does not support the ALJ's RFC.  Plaintiff then argues that the hypothetical question posed by the ALJ to the vocational expert did not include all of Plaintiff's limitations.  As a result of that failure, Plaintiff maintains that the vocational expert's testimony cannot constitute substantial evidence.

The Court rejects both of Plaintiff's arguments, for the reasons that follow.

### 1.    Substantial evidence supports the ALJ's decision

Plaintiff argues that the ALJ cherry-picked the record to deny her her disability benefits and impermissibly ignored evidence favorable to Plaintiff.  The Court finds that Plaintiff's argument does not merit an award of benefits or remand; more than a scintilla of evidence exists that would support a reasonable conclusion that Plaintiff's mental condition did not disable her to perform unskilled work.  The ALJ also properly addressed those opinions that were more favorable to

Plaintiff's argument.

The substantial evidence exists in the form of Plaintiff's own testimony, the medical records, and the ALJ's questions to the vocational expert.

At the hearing, Plaintiff stated that her schizoaffective disorder prevented her from working. (AR at 35.) But when the ALJ asked her to opine what about her condition prohibited her from working, she stated that she could not answer the question because she was not working. (*Id.*) She also testified that the medications she was taking were helping her, although she had crying spells once or twice a month. (*Id.*) And she testified that her disorder affected her interest in interacting with other people. (*Id.* at 37.) As to her daily life, she testified that she is able to conduct much, if not all, of her daily activities independently. She shares duties managing her finances, helps prepare breakfast for herself and her husband, attends classes consistently, is involved somewhat in extracurricular activities, uses public transportation, reads, and watches television. (*Id.* at 42.)

When questioned by her attorney, Plaintiff testified that her depression does affect her to the point that she cannot leave her house, but these bouts of depression only happen once a week and include five to ten minutes of sadness. (*Id.* at 44.)

Medical evidence also adds to the testimony evidence that Plaintiff's mental impairments do not affect her to the point of her being disabled. Although there are reports that show Plaintiff attempted suicide in 2005 and suffered from depression and schizoaffective order, the same reports also show that, as time progressed, records show that her intellectual functioning was within the average limits and she retained her judgment. (See AR at 231, 241 (finding that Plaintiff's symptoms had lessened.).)

After her alleged disability date, in September 2008 Plaintiff filled out a disability report on

18

which she stated that she "personally [didn't] see a challenge with working." (AR at 141.) On this report she also stated that there was nothing that she could do before her disability that she could not do at the time of filling out the report. (*Id*. at 150.) The extent her disorder affected her, she report, related to her sleep (making her restless), shaky, and altering her mood. (*Id*.) On this report, she did state that she had problems completing tasks on concentration. (*Id*. at 154.) But in work situations, Plaintiff stated that she was able to follow written instructions well, spoken instructions fairly well, and was able to get along with authority figures. (*Id.*) A second disability report shows that Plaintiff stated her condition may have gotten worse, but she had no new symptoms. (*Id*. at 168.)

In a 2008 report, Dr. Rosenbaum noted that Plaintiff was flat and detached and felt overwhelmed with too many tasks at times, but he also found that Plaintiff was "pleasant, insightful, and quite compartmentalized in her thinking." (AR at 267-68.) And he noted that Plaintiff was "matter-of-fact" and that she slept well and had a normal appetite. (*Id*. at 268.)

Throughout 2009 Plaintiff saw Dr. Rion, who noted that Plaintiff was on her medications, experienced no distress, and was able to cope with her feeling down and concentration and task completion issues using coping skills and notepads. (AR at 354.) In later meetings, Dr. Rion echoed his previous findings that Plaintiff was feeling well and was not experiencing problems. (AR at 352, 350.)

The testimony, Plaintiff's own disability report, and medical opinions show that the ALJ was correct in not finding Plaintiff's condition so severe as to find her disabled.

The ALJ also properly discussed and rejected Rendon's opinion. Here, even if Rendon's opinion were to be treated as a treating source (there is no indication that her opinion should be

19

treated so), the ALJ properly discussed why he rejected the opinion.[4]   Rendon circled certain

answers on her report and did not offer explanations that were supported by the record.  Rendon

---

[4]The Commissioner has imposed "certain standards on the treatment of medical source evidence."  *Cole v. Astrue*, –F.3d–, 09-4309, 2011 WL 5456617, at *4 (6th Cir. Sept. 22, 2011) (citing 20 C.F.R. § 404.1502).  Under the treating source rule, the ALJ must "give a treating source's opinion controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Id*. (citing 20 C.F.R. § 404.1527(d)(2)).  If the ALJ does not give controlling weight to the treating source's opinion, he "must then balance the following factors to determine what weight to give it:" "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id*. (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) and 20 C.F.R. § 404.1527(d)(2)).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion."  *Id*. (citation omitted).  "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id*. (citation omitted).

The Sixth Circuit has "made clear" that it will remand the Commissioner's determination if it has not provided good reasons for the weight it has given to a treating physician's opinion. *Id*. at *10 (citing *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)).

If the ALJ fails to follow and agency rule or regulation, then the ALJ's failure "denotes a lack of substantial evidence, even where the [ALJ's conclusion] may be justified based upon the record."  *Id*. at *3 (citation omitted).

But a failure to follow the treating source rule can be deemed "harmless" if the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it[.]" *Id*. (citation omitted).  "An opinion may be patently deficient if the treating source offers no explanation to support it."  *Fleming v. Comm'r of Soc. Sec.*, 10-25, 2011 WL 3049146 at *9 (E.D.Tenn. July 5, 2011) (citing *May v. Astrue*, 09-00090, 2009 WL 4716033 at *8 (S.D.Ohio Dec. 9, 2009) (finding treating source opinion patently deficient where treating source simply checked boxes about the plaintiff's alleged disability and failed to provide supporting explanations or objective evidence.").  *See also Sisk v. Astrue*, 09-220, 2010 WL 3522307 at *10 (E.D.Tenn. Aug. 20, 2010) (holding that the ALJ's written decision met the goal of the treating source rule when the decision attacks the consistency of the treating source's opinion with other record evidence or the supportability of that opinion, for example, by pointing to an absence of clinical and diagnostic findings; and citing  *Nelson v. Comm'r of Soc. Sec*., 195 F. App'x 462, 470-72 (6th Cir. 2006)).  The ALJ must show "at least implicitly" why he "rejected" the treating source's opinion.  *Id*.

20

found that Plaintiff could not work forty hours a week, but she offered no explanation save for "[a]bility to retain information/memory is impaired making task completion difficult." (AR at 330.) The Court finds Rendon's opinion was inadequately explained and not supported by the record; the ALJ was correct in addressing it, but not relying upon it.

### 2.        The ALJ's hypothetical was proper

Plaintiff argues that the ALJ's hypothetical did not capture Plaintiff's mental limitations. (Pl.'s Mot. for Summ. J. at 9.)   Plaintiff states that there "is simply nothing in this hypothetical which relates in any way to concentration."  (*Id*. at 11.)    She further argues, citing *Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D.Mich. 2005), that a "reference merely to 'unskilled sedentary work' in a hypothetical question is insufficient to describe and accommodate concentration deficiencies." (citation omitted).   There, the court held that the ALJ found that the plaintiff had a moderate limitation in her ability to concentrate, persist and keep pace.  *Id*.  With that finding, the ALJ then determined that the plaintiff's limitations "were with co-workers, supervisors and the public, and to 'jobs entailing no more than simple, routine, unskilled work.'" *Id*.  The magistrate judge held that the plaintiff may have been unable "to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."  *Id*.  The magistrate judge then held that the current hypothetical was not adequate on the issue of moderate limitations of concentration, persistence and pace.  *Id*.

Despite the magistrate judge's holding and the district court's acceptance of the holding, other courts in this district have disagreed with the *Edwards* holding.  In *Lewicki v. Commissioner of Social Security*, No. 09-11844, 2010 WL 3905375, at *3 (E.D.Mich. Sept. 30, 2010) (Ludington, J.), the court, citing the report and recommendation, held that "[d]ecisions in this district reflect the

21

conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work." (citations omitted). That court also stated, "[t]here may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. [The plaintiff] does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace." *Id*. The ultimate question, therefore, is whether the ALJ's decision was supported by substantial evidence. *Id*. *See also Schalk v. Comm'r of Soc. Sec.*, No 10-13894, 2011 WL 4406824, at *11, n 6, 7 (E.D.Mich. Aug. 30, 2011)(Michelson, Mag. J.) (accepted and adopted by 2011 WL 4406332 (E.D.Mich. Sept. 22, 2011)) (discussing how "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, [the court] must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC.").

The Court agrees with the latter cases as well as Defendant's argument that "a hypothetical question need not incorporate a listing of the claimant's medical conditions, [so long as] the vocational expert's testimony . . . take[s] into account the claimant's functional limitations, i.e., what he or she 'can and cannot do.'" *Infantado v. Astrue*, 263 F. App'x 469, 476 (6th Cir. 2008) (quoting *Webb v. Comm'r of Social Sec.*, 368 F.3d 629, 632-33 (6th Cir. 2004)).

Here, the ALJ's hypothetical question took into account what Plaintiff can and cannot do, and the ALJ's determination of Plaintiff's RFC, as discussed above, was supported by substantial evidence. Again, the ALJ asked:

> Let me ask you to consider a hypothetical individual dealing with the same background as [Plaintiff]. Who, again, was limited to simple routine tasks consistent with unskilled work. And no more than occasional contact with the general public. No physical restrictions other than avoidance of unprotected heights or hazardous

22

moving machinery.  Assume a hypothetical individual with that residual functional capacity.  Could you identify jobs that exist in the economy and, if so, if you would indicate the manner in which the jobs classified with regard to the exertional level, and number of jobs in each occupation[.]

(AR at 49.)  The vocational expert testified that Plaintiff could work as a housekeeper/cleaner, or a linen room attendant of a hotel or restaurant, or a launderer.  (*Id.*)  The vocational expert then testified that there were ample number of jobs in the national and Michigan economies that Plaintiff could secure.  (*Id.*)  And the vocational expert stated that the jobs listed "would involve little or no public contact."  (*Id.*)  The ALJ asked a follow up question: "[a]ssuming the same hypothetical individual would anticipate to miss one or more days a week on a regular and ongoing basis.  Would all those jobs you've described maintain all full time competitive employment [] ?"  (*Id.*)  The vocational expert responded affirmatively.  (*Id.*)

The hypothetical took into account mental limitation, as a moderate limitation in concentration, pace, and persistence is encompassed in unskilled work. *Lewicki*, 2010 WL 3905375, at *3.  The ALJ also included Plaintiff's background in the hypothetical–whether a job would allow Plaintiff to have minimal or no public contact and whether a job would allow Plaintiff to miss one or more days a week, which was consistent with Plaintiff's testimony that she was unable to leave the house one or two days a week due to her depression.  The vocational expert testified that there would be jobs that Plaintiff could perform.

The Court therefore finds that the ALJ's hypothetical was proper and supported by substantial evidence.  The Court therefore rejects Plaintiff's second argument.

**D.    Conclusion**

For the above-stated reasons, the Court recommends DENYING Plaintiff's motion for summary judgment, GRANTING Defendant's motion for summary judgment, and DISMISSING

this case.

### III.   Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


Dated:  December 1, 2011                    s/ Mona K. Majzoub_____
                                            MONA K. MAJZOUB
                                            UNITED STATES MAGISTRATE JUDGE

24

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: December 1, 2011            s/ Lisa C. Bartlett
                                   Case Manager